UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:21-cr-00175-LEW |
| | ) | |
| LUCAS SIROIS, | ) | |
| | ) | |
| Defendant | ) | |

## **ORDER**

This matter is before the Court on Defendant Lucas Sirois's objections to the Revised Presentence Investigation Report (PSR) (ECF No. 756) prepared by U.S. Probation and Pretrial Services in advance of his sentencing hearing. Although it is my usual practice to reserve ruling on objections until sentencing, I address certain of Defendant's contentions now in order to make the most efficient use of the Court's limited time and resources.[1]

**A.     Defendant's Objection to Drug Quantity and Request for an Evidentiary Hearing**

In his sentencing memorandum (ECF No. 771), Defendant contends that the Rohrabacher-Farr Amendment[2] bars his punishment for conduct that substantially

---

[1] To the extent the parties' sentencing memoranda make arguments pertaining to the sentencing factors set out at 18 U.S.C. § 3553(a) that do not bear upon Defendant's objections to the PSR or Guidelines calculation, I do not address them here.

[2] The Rohrabacher-Farr Amendment is a federal appropriations rider that "prohibits DOJ from spending money on actions that [prevent states with medical marijuana laws from] giving practical effect to their state laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *United States v. Bilodeau*, 24 F.4th 705, 712-13 (1st Cir. 2022) (internal citation omitted).

complied with Maine's medical marijuana laws. Now he requests an evidentiary hearing to determine what quantity of marijuana is "punishable." He contends that the answer is none, or, in the alternative, 486 kilograms (the quantity attributable to sales to Brandon Dagnese).

"It is a familiar rule that a criminal defendant, about to be sentenced, is not entitled to an evidentiary hearing on demand." *United States v. Rodriguez*, 336 F.3d 67, 70 (1st Cir. 2003). "[T]he decision to hold an evidentiary hearing at the time of sentencing, or alternatively, to eschew such a hearing, lies within the sound discretion of the sentencing court*." United States v. Robles-Torres*, 109 F.3d 83, 85 (1st Cir. 1997). "Faced with a timely request for such a hearing, the court must consider the totality of the circumstances and assess the likely utility of a hearing in that light." *Rodriguez*, 336 F.3d at 70. "[E]videntiary hearings at sentencing are—and should remain—the exception rather than the rule." *Robles-Torres*, 109 F.3d at 85. In light of the particular history of this case and the nature of the issues to be resolved at sentencing, I am not persuaded that the hearing Defendant requests is called for.

The issue of Defendant's compliance with Maine's medical marijuana laws has already been comprehensively litigated and decided, reviewed and affirmed. It was the subject of extensive briefing and a three-day hearing, at which the Government presented evidence that included the testimony of eight witnesses. With the benefit of this record, I concluded that the prosecution could proceed. *See* Order on Defendants' Motion to Enjoin Prosecution (ECF No. 455). So did the First Circuit. *See United States v. Sirois*, 119 F.4th 143 (1st Cir. 2024). In reaching that conclusion, the First Circuit determined that it was

manifest from the record that Defendant had failed to show by a preponderance of the

evidence that he had substantially complied with Maine law. *Id*. at 157. Specifically, the

Court observed that the Government had "introduced significant affirmative evidence" that

the Shoe Shop operated as a "collective" in violation of Maine law.[3] *Id*. at 154 (citing 22

M.R.S. §§ 2430-D, 2422(1-A)). I quote the opinion at length to remind Defendant of what

the evidence indicated:

> This evidence tended to show that the marijuana purportedly belonging to individual caregivers in fact belonged to Lakemont LLC, a limited liability corporation co-owned by Lucas Sirois and another individual, Randall Cousineau, who at no point was an OCP-registered[4] caregiver. The government also put forth evidence that Lucas Sirois closely controlled the operations of the Shoe Shop and that Shoe Shop-affiliated caregivers, in exchange for weekly flat-rate payments, provided their caregiver licenses to others but did not participate in cultivating or selling marijuana.
>
> For example, the government introduced a spreadsheet titled "Shoe Shop" that contains one column labeled "Income" and thirty-four columns, each labeled with the name of an individual, grouped under the heading "Caregivers." The spreadsheet is further divided into rows that correspond to weekly periods. The government elicited testimony from Dave Burgess, who worked at the Shoe Shop, who confirmed the document was, as to that business, a "tally of the caregivers, maintenance people, and trimmers and what they got paid each week." The amounts listed within each caregiver column generally repeat week after week without regular variation, even as

---

[3] Relatedly, Defendant argues that the Government should be judicially estopped from arguing that "all marijuana should count," Def. Mem. at 6, based on representations the Government made at oral argument before the First Circuit in response to this hypothetical: "[W]hat should happen if the defendant showed substantial compliance except for the black-market allegations?" Def. Mem. at 2. The First Circuit ultimately rejected that hypothetical, concluding that Defendant had not shown substantial compliance with Maine's prohibition on "forming or participating in a collective." *Sirois*, 119 F.4th at 147 (cleaned up). Defendant's characterization of that decision as "enforc[ing] government concessions made at oral argument" or "adopt[ing] and rel[ying] on the represented position" is therefore unpersuasive. Def. Mem. at 6.

[4] Maine's Office of Cannabis Policy ("OCP") is the office tasked under the Maine Medical Use of Cannabis Act (the "Act"), 22 M.R.S. § 2421 *et seq.*, with administering the Maine Medical Use of Marijuana Program ("MMMP"), including the registration and licensing of participating caregivers and assistants. *See Sirois*, 119 F.4th at 146-47 (describing Maine's regulatory scheme).

the corresponding amounts listed in the "Income" column vary widely between from [sic] one week to the next. For example, in the weeks marked 2/17, 2/24, 2/28 and 3/6, income varies from $3,590 to $240,120, but the amounts listed in the caregiver columns generally repeat consistently throughout this period.

The government also introduced a services agreement signed by Lucas Sirois and a caregiver who had a grow room at the Shoe Shop. This agreement indicates that Lakemont would provide services including drying and curing, packing, production of marijuana extract, facilitating sales, and delivering marijuana for the caregivers.

Additionally, individuals who had worked at the Shoe Shop testified that, in exchange for flat weekly payments, they allowed marijuana to be grown and sold in their name and with their license without their necessary participation in cultivating marijuana, selling marijuana, or interacting with patients. For example, Juneva Stratton, who was an OCP-licensed caregiver and had a grow room at the Shoe Shop, testified that someone at the Shoe Shop applied for the OCP caregiver license on her behalf, that she "wasn't involved in [the operations] at all," and that she nonetheless received an envelope with cash in it every week from her daughter, who was herself a licensed caregiver who also was affiliated with the Shoe Shop. Burgess himself testified that he was paid weekly flat-rate payments to assign his caregiver license to a particular grow room, but he never did any work in the room; did not select, supervise, or pay the people who worked in the room; and did not participate in selling the marijuana grown in the room. In addition, a former Shoe Shop employee, Seth Neal, testified that Lakemont employed a number of "trimmer[s]" at the Shoe Shop who, rather than acting as assistants to individual caregivers, worked together to gather and process for distribution all the marijuana cultivated at the Shoe Shop.

The government also called OCP Director Vernon Malloch as a witness. Malloch testified that "sharing plants" and "sharing . . . proceeds" from marijuana transactions serve as a "bright-line distinction that [the OCP] look[s] at" to identify collectives. He further testified that if "a single caregiver facilitated the paperwork transaction to get [other caregivers] licensed, that would be a "red flag." In addition, Malloch testified that a business entity comprised of multiple caregivers is "not authorized" and that such a company "[w]ould likely be considered a collective." He testified, too, that a business model like that of Lakemont LLC, in which one OCP-licensed caregiver and one unlicensed individual share profits from the licensed caregiver's distribution of marijuana, would be illegal under the Act. Finally, Malloch testified that if the OCP became aware of such an arrangement it "would make a referral to law enforcement" and "potentially

take action against the caregiver who is partnering with [the unlicensed individual]."

*Id*. at 154-55.

The First Circuit noted that Lucas Sirois did not "directly dispute any of this testimony," while acknowledging and dismissing his various quibbles with the evidence outlined above. *Id*. at 155. It also considered Defendant's evidence—including, for example, the 2019 OCP investigation of his operations that resulted in no finding of noncompliance and the later reinstatement of his caregiver license (which had been suspended following execution of a federal search warrant at the Shoe Shop)—and found that insufficient "to show that he was in substantial compliance with the Act and its regulations." *Id*. at 156.

Separately, the First Circuit concluded that it was manifest from the record that Defendant failed to show to a preponderance of the evidence that he did not engage in black-market sales, in violation of Maine law. *Id.* at 157. Again, I quote at length as a reminder:

> [T]he record contains testimony from Burgess and Brandon Dagnese that tends to show that Lucas Sirois not only knew of, but personally conducted and directed, black-market sales of marijuana through Dagnese between 2018 and 2020.
>
> Burgess testified that he conducted sales of marijuana at the direction of Lucas Sirois to Dagnese and that Burgess understood these sales were intended for the black market. Burgess further testified that Lucas Sirois offered him additional income to facilitate the sales to Dagnese, that the volume of sales was unusually large, and that the sales were generally not recorded in Lakemont LLC's books.
>
> Further, Dagnese testified that he had never held an OCP caregiver or patient license, that he had purchased approximately $1 to $1.5 million dollars' worth of marijuana from Lucas Sirois between 2018 and 2020 with the

intention to resell on the black market despite not having a license, that some of those sales had been conducted by Lucas Sirois himself, and that Lucas Sirois never requested a caregiver license from him.

*Id*. Although the First Circuit acknowledged Defendant's attacks on the credibility of these witnesses (particularly Dagnese), it emphasized that Defendant did not "directly dispute the testimony of Burgess or Dagnese" and that there was "undisputed evidence" of transactions between Defendant and Dagnese. *Id*. at 157-58. Defendant argued then, as he does now, that there is no evidence he had knowledge of Dagnese's black-market resales, but the First Circuit concluded that this did not matter, since Defendant knew (or at least, could not prove he did not know) that Dagnese was unlicensed. *Id*. at 158. The First Circuit concluded that Defendant failed to show that his marijuana cultivation and sales activities substantially complied with Maine's medical marijuana laws. *Id.* at 158 ("Thus, just as we conclude that it is manifest in the record that Lucas Sirois has failed to show by a preponderance of the evidence that he was not operating the Shoe Shop as a collective, we also conclude that it is manifest in the record that he has failed to show that he engaged in no black-market sales.").

When Defendant moved pretrial to enjoin his prosecution, he bore the burden to prove by a preponderance of the evidence that he had substantially complied with Maine law. *Sirois*, 119 F.4th at 152-53. He failed to do so. He now argues that at sentencing the inquiry is instead "what quantity of marijuana is attributable to punishable conduct."[5] Def.

---

[5] That said, Defendant's contention that *none* of the marijuana he grew and sold is "punishable" under the Rohrabacher-Farr Amendment indicates that he does not seek an accounting of "compliant" and "non-compliant" drug quantities, but a broader inquiry into the extent to which his marijuana operation taken as a whole complied with Maine law—in other words, a redux of the evidentiary hearing previously held in connection with his motion to enjoin the prosecution.

Mem. at 8. To my knowledge, none of the cases Defendant cites indicate that a court that has allowed a prosecution to proceed following pretrial inquiry into the applicability of the Rohrabacher-Farr Amendment must reopen that inquiry at sentencing. I see no reason to believe that the applicability of the Rohrabacher-Farr Amendment at the punishment phase calls for a different inquiry than that which was already conducted pretrial.[6] *See, e.g., United States v. Pisarski*, 965 F.3d 738, 741-42 (9th Cir. 2020); *United States v. Kleinman*, 880 F.3d 1020, 1027-28 (9th Cir. 2017). Having attempted but failed to demonstrate substantial compliance during the pretrial Rohrabacher-Farr proceedings, the trial ship set sail and Defendant now stands convicted of trafficking a substantial quantity of marijuana, all of which was illicit under federal law. A priori, the "conduct forming the basis" of the Controlled Substance Act charges on which Defendant is to be sentenced, *Kleinman*, 880 F.3d at 1028, is the same conduct that was at issue in Defendant's motion to enjoin his prosecution. Given the First Circuit's conclusions on this topic and the extensive record developed during the pretrial Rohrabacher-Farr proceedings, there is no utility in a hearing on these old matters anew for purposes of sentencing. Nor am I inclined to allow Defendant to relitigate an issue that has already been decided by the jury.

---

[6] As the Ninth Circuit has repeatedly emphasized, the rider "did not change any substantive law; it merely placed a temporary hold on the expenditure of money for a certain purpose." *United States v. Kleinman*, 880 F.3d 1020, 1028 (9th Cir. 2017); *see also United States v. Evans*, 929 F.3d 1073, 1077 (9th Cir. 2019). It seems to me, then, that a defendant seeking to enforce the rider is limited to injunctive relief (of the variety Defendant tried and failed to obtain in advance of trial) or perhaps a habeas petition attacking the execution of his sentence, where no pretrial hearing was conducted. *See*, *e.g., Sandusky v. Goetz*, 944 F.3d 1240, 1246-47 (10th Cir. 2019). The defendant bears the burden of proving his entitlement to either form of relief. *See Sirois*, 119 F.4th at 152-53; *Evans*, 929 F.3d at 1076-77; *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998); *Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009).

Probation calculates Defendant's base offense level as 30 with respect to Count Group 1, based in part on a determination that the offense involved at least 1,000 kilograms, but less than 3,000 kilograms, of marijuana.  PSR ¶ 43; U.S.S.G. § 2D1.1(c)(5).  "The sentencing court need only determine drug quantity by a preponderance of the evidence," which requires only a "reasonable approximation of the weight of the controlled substance(s) for which the defendant should be held responsible." *United States v. Mello*, 164 F.4th 120, 131 (1st Cir. 2026) (internal citations omitted).  "Where . . . the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."  U.S.S.G. § 2D1.1, cmt. n.5.  There are a variety of possible angles from which to approach Defendant's drug weight calculation.[7]  Probation calculated Defendant's drug weight by starting with the marijuana seized on July 21, 2020, from various facilities (1,002.83 kilograms) and adding to that an estimate based on Lakemont LLC's income from 2017 to 2020 (959.765 kilograms), for a total drug weight of 1,962.595 kilograms.  PSR ¶¶ 21, 27; *see also* U.S.S.G. § 2D1.1, cmt. n.5 (to approximate drug quantity, "the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and size or capability of any laboratory involved").  I agree with Probation's assessment that this estimate is quite conservative.[8]  My own estimate,

---

[7] Again, Defendant urges a calculation that excludes marijuana he contends was "state legal"—that is, all of it, with at most the limited exception of the quantity involved in transactions with Dagnese (which he calculates as between 324 and 486 kilograms).  In light of Defendant's failure to prove his substantial compliance with Maine law and the evidence summarized above that Defendant was operating a collective in violation of Maine law, I will not adopt this proposed calculation.

[8] As explained in the PSR, if one were to estimate quantity based on a combination of what was seized on July 21, 2020, David Burgess's estimate that the Shoe Shop produced more than 56 pounds of finished

based on the most defendant-friendly interpretation of the trial testimony of Defendant's coconspirators, was approximately 2,000 kilograms. *See* Order on Defs. Mot. for J. of Acquittal and New Trial at 10 (ECF No. 752) ("Even by the most conservative measure, the evidence was more than sufficient to allow the jury to conclude beyond a reasonable doubt that Lucas Sirois was responsible for a quantity of marijuana exceeding 1,000 kilograms over the course of the conspiracy charged in Count One."). It should go without saying that evidence sufficient for a jury to conclude beyond a reasonable doubt that more than 1,000 kilograms of marijuana was attributable to the Defendant is also sufficient to conclude as much by a preponderance of the evidence, for purposes of Defendant's offense level on those counts.

Finally, Defendant contends that because "the jury was never asked to find that 1,000 or more plants of *punishable* marijuana" were attributable to him, the 10-year minimum sentence required under 21 U.S.C. § 841(b)(1)(A) does not apply. Def. Mem. at 11 (citing *Alleyne v. United States*, 570 U.S. 99 (2013)). But the Rohrabacher-Farr Amendment "did not change any substantive law; it merely placed a temporary hold on the expenditure of money for a certain purpose." *Kleinman*, 880 F.3d at 1028; *see also United States v. Evans*, 929 F.3d 1073, 1077 (9th Cir. 2019) ("[T]he appropriations rider does not amend the CSA to impose a new element for federal marijuana crimes. . . . Thus, the Government need not prove [a defendant's] non-compliance with state law beyond a reasonable doubt in order to convict them."). The jury found that the quantity of marijuana

---

marijuana per week, and William Brey's estimate of 40 pounds per week from 105 Avon Street, Defendant's base offense level would be two levels higher. PSR ¶ 27 n.2.

attributable to Lucas Sirois exceeded the threshold set by statute, beyond a reasonable doubt. *See* Jury Verdict Form (ECF No. 699); 21 U.S.C. § 841(b)(1)(A)(vii). As a result, I am "bounded by the floor . . . previously set by the jury's verdict" and will not be at liberty to impose a sentence that disregards the minimum term of imprisonment mandated by statute.[9] *United States v. Walker-Couvertier*, 860 F.3d 1, 17 (1st Cir. 2017).

## B. Defendant's Objection to Role Enhancement

Defendant also objects to Probation's application of a four-level aggravating role enhancement under U.S.S.G. § 3B1.1(a). *See* PSR ¶ 47. Instead, Defendant contends that the evidence supports a three-level enhancement at most. *Compare* U.S.S.G. § 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.") *with* § 3B1.1(b) ("If the defendant was a manager or supervisor (but not an organizer or leader) . . . increase by 3 levels."). He maintains that other participants (namely, Randall Cousineau and William Brey) were coequal partners, and the caregivers operated independently.[10] The First Circuit has made "clear that the existence of another leader—even one superior to [the defendant] in the scheme's hierarchy—does not foreclose the possibility of [the defendant] also acting as a leader." *United States v. Coplin-Benjamin*, 79 F.4th 36, 42 (1st Cir. 2023).

---

[9] Defendant's additional contention that, notwithstanding the 10-year mandatory minimum sentence imposed by statute, the Bureau of Prison's expenditure on his incarceration is prohibited by the Rohrabacher-Farr Amendment and should be enjoined, *see* Def. Mem. at 12-13, is a variety of collateral attack not properly before the Court at sentencing.

[10] The PSR notes that Defendant would like an evidentiary hearing on this question, but Defendant has not elaborated on that request in his sentencing memorandum. Given what the record before me has to say about Defendant's role in the conspiracy for which he was convicted, I do not believe that additional testimony would aid in resolving this dispute.

Moreover, "a defendant need not exercise complete hegemony over the entire criminal enterprise in order to qualify as an organizer." *United States v. Rodriguez*, 115 F.4th 24, 52 (1st Cir. 2024) (internal citation omitted). "In making the determination of whether someone is an 'organizer or leader' or merely a 'manager or supervisor,' courts should consider 'the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.'" *Coplin-Benjamin*, 79 F.4th at 41 (quoting U.S.S.G. § 3B1.1 cmt. n.4); *see also Rodriguez*, 115 F.4th at 52. "This list is 'representative rather than exhaustive,' and 'proof of each and every factor' is not necessary to establish that a defendant acted as an organizer or leader." *Id*. (internal citations omitted).

"The government bears the burden of proving the applicability of upward role-in-the-offense adjustments by a preponderance of the evidence." *United States v. Rivera*, 51 F.4th 47, 51 (1st Cir. 2022). To meet this burden, the Government has pointed to Probation's account of the various individuals involved in the conspiracy and their respective roles. *See* Gov't Memo at 4-5; PSR ¶¶ 18-20; Addendum to PSR p. 46-48. It seems clear enough to me that a number of these individuals (including, for example, David Burgess) reported to Lucas Sirois and acted at his direction. I find implausible Defendant's contention that those who worked at his facilities were independent "caregivers," in light of the evidence indicating that caregivers were paid a consistent, weekly salary and had little to do with the cultivation or selling of the marijuana purportedly grown under their

licenses. Lucas Sirois was also co-owner of each of the businesses, from which he reaped significant profits. The Government also observes that he engaged in recruiting and hiring into the operation, and organized transactions (including, for example, the sales to Brandon Dagnese). This is more than sufficient to support the conclusion that Defendant was an organizer or leader, for purposes of the four-level role enhancement. *See Rodriguez*, 115 F.4th at 51-52.

## C. Defendant's Objection to Criminal Livelihood Enhancement

Defendant objects to Probation's application of an additional two-level enhancement for "a pattern of criminal conduct engaged in as a livelihood." PSR ¶ 45A; U.S.S.G. § 2D1.1(b)(16). "'Pattern of criminal conduct' means planned criminal acts occurring over a substantial period of time," which "may involve a single course of conduct or independent offenses." U.S.S.G. § 4B1.3 cmt. n.1; U.S.S.G. § 2D1.1 cmt. 20(C). "Engaged in as a livelihood" has a two-part definition: first, that "the defendant derived income from the pattern of criminal conduct" exceeding $14,500, and second, that "the totality of the circumstances shows that such criminal conduct was the defendant's primary occupation"—that is, that "the defendant engaged in criminal conduct rather than regular legitimate employment" or that "the defendant's legitimate employment was merely a front for the defendant's criminal conduct." U.S.S.G. § 4B1.3 cmt. n.2; U.S.S.G. § 2D1.1 cmt. 20(C). Defendant's objection to this enhancement rests on his contention that his businesses were legitimate—that is, "legal under Maine law." Def. Mem. at 15. As explained above, I disagree with that assessment of the status of Defendant's businesses under the law.

**D.      Defendant's Objection to Tax Loss and Restitution**

Defendant objects to the tax loss calculation contained in the PSR, which does not include deductions disallowed under Section 280E of the Internal Revenue Code.  *See* 26 U.S.C. § 280E ("No deduction or credit shall be allowed for any amount paid or incurred during the taxable year in carrying on a trade or business if such trade or business (or the activities which comprise such trade or business) consists of trafficking in controlled substances (within the meaning of schedule I and II of the Controlled Substances Act) which is prohibited by Federal law or the law of any State in which such trade or business is conducted.").  Defendant points to the recent rescheduling of marijuana "included in an FDA-approved drug product or . . . subject to a state-issued license to manufacture, distribute, and/or dispense marijuana or products containing marijuana for medical purposes" from Schedule I to Schedule III,[11] and argues that as a result, Section 280E no longer applies, the deductions disallowed thereunder "were legitimate business expenses, and the tax loss is overstated."  Def. Mem. at 15.  Defendant also argues that Section 280E would not apply to income derived from lawful hemp or cannabis products.  Addendum to PSR at p. 48.  To the extent Defendant's rescheduling argument is premised on the supposition that Defendant's businesses were operating in compliance with Maine's medical marijuana laws, that objection is overruled.  Otherwise, while the Guidelines advise that "the court should account for any unclaimed credit, deduction or exemption that is needed to ensure a reasonable estimate of tax loss," such accounting is only appropriate

---

[11] *See* Schedules of Controlled Substances: Rescheduling of Food and Drug Administration Approved Products Containing Marijuana From Schedule I to Schedule III; Corresponding Change to Permit Requirements, 91 Fed. Reg. 22,714, 22,714-15 (Apr. 28, 2026).

if "the credit, deduction, or exemption is reasonably and practicably ascertainable." U.S.S.G. § 2T1.1, cmt. n.3. Moreover, "[t]he burden is on the defendant to establish any such credit, deduction, or exemption by a preponderance of the evidence." *Id*. So far, Defendant has not made this showing, but I will reserve final ruling on this aspect of the objection.

## CONCLUSION

Defendant's Objections No. 1, 2, and 4 (as numbered in the Addendum to the Revised PSR) are OVERRULED. Defendant's Objections No. 3 and 5 are RESERVED, as outlined above. Defendant's request for an evidentiary hearing on the subject of his compliance with Maine law is DENIED.

SO ORDERED.

Dated this 1st day of June, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge